UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
==================================X
UNITED STATES OF AMERICA,

                                       **AFFIDAVIT**

       - against -                                 Indictment No. 07 Crim. 732

OSCAR LEMUS,

                     Defendant.
==================================X

STATE OF NEW YORK      )
                                ) ss.:
COUNTY OF WESTCHESTER  )

      **CHRISTOPHER RILEY**, being duly sworn, deposes and makes the following statements:

      1.      I am an attorney at law admitted to practice in the State of New York and in the United States District Court for the Southern District of New York. I am the attorney for the defendant Oscar Lemus herein and I am fully familiar with all the facts and circumstances of the instant case.

      2.      This affidavit is made upon information and belief and upon a review of the Indictment, Felony Complaint, and discovery had herein, and is submitted in support of the within motion wherein the defendant Oscar Lemus seeks Orders of this Court granting specific and varied relief as set forth in the annexed Notice of Motion.

      3.      Defendant Oscar Lemus is charged in Indictment No. 07 Crim. 732 with two counts of transferring false identification documents. Count One of the Indictment alleges the transfer of two (2) identification documents on February 11, 2007 somewhere in the Southern District of New York. Count Two alleges the transfer of ten (10) documents on or about March 3, 2007 somewhere in the Southern District of New York. A copy of the Indictment herein is attached hereto as Exhibit "A".

1

4. The defendant was originally arraigned on these charges before Magistrate Judge Fox and the matter was subsequently assigned to the Honorable Stephen C. Robinson, U.S.D.J.

### A. The Arrest

5. On June 12, 2007, at or about 10:00 a.m., defendant was working in the Town of Stony Point, County of Rockland, State of New York.  At that time, he received a telephone call from an individual representing himself to be a representative of the gas company and advising him that he had to immediately return to his home since there was a gas leak.  Defendant advised that individual that there were other people at his home and he would not leave work.

6. Shortly thereafter, defendant received a second telephone call from this individual who then identified himself as an agent with the Immigration and Naturalization Services. Defendant was advised by this agent that he had to return to his home immediately.  When defendant advised the agent he could not leave work and did not have to cooperate since his immigration status was legal, he was advised that if he did not immediately give his location to the agent that within five minutes his legal status would be revoked and he would be illegal. Under such threat, defendant advised as to his location.

7. At or about 10:30 a.m., said agent appeared at defendant's workplace in the Town of Stony Point, County of Rockland and State of New York.  At that time, defendant was told to move away from his co-workers towards the agent's car.  His wallet and cell phone were seized from him and he was physically pushed into the back of the agent's car by the agent.  He was transported by the agent to the Stony Point Police Department where he was kept for approximately five to six hours.

8. At or about 3:45 p.m., he was transported from the Stony Point Police Department by the federal agent to the Spring Valley Police Department where he was held until a little after 10:00 p.m. that evening.  He arrived at the Federal Courthouse in the City of White Plains,

County of Westchester, State of New York, at or about 11:00 p.m. having spent approximately thirteen hours in custody before being produced at the courthouse. The distance between Stony Point, New York and/or Spring Valley, New York to the Federal Courthouse in White Plains, New York is approximately 25 miles.

9. Defendant was told that he would not be allowed to make any telephone calls that day and could not make a telephone call until the following day after he had been arraigned in court. However, at 4:00 p.m. he was finally allowed to telephone a friend at which point he requested his friend to arrange for an attorney for him. An attorney called the Spring Valley Police Department on his behalf requesting that he be advised whether Oscar Lemus was in custody and whether he could speak to him. The attorney was advised by the officer who had answered the telephone that the Police Department would neither confirm nor deny that Mr. Lemus was in custody. The attorney was told to show up at 8:00 a.m. the following day if he wanted to see Mr. Lemus but to "be prepared to drive".

10. During this time, defendant was never given his Miranda warnings.

11. The prosecution has alleged that during such time, defendant made inculpatory statements. See Exhibit "B" attached hereto.

## B. Identification

12. The prosecution has not given defendant any facts relative to any out-of-court identification. However, the prosecution provided in the course of discovery a certain photo array, a copy of which is attached hereto as Exhibit "C".

13. Under the circumstances presented and the paucity of the information supplied, defendant has no way of knowing the identity of any individual who may have chosen defendant out of any such photo array, or the circumstances relative thereto. However, in order to have an orderly trial and prevent undue disruption of trial if any in-court identification is proffered, it is

3

respectfully submitted there should be a pretrial hearing as to any such identification or alternately that the prosecution be directed to set forth the facts and circumstances relative to any such identification.

### C. The Alleged Informant

14. As set forth in the Felony Complaint (a copy of which is attached hereto as Exhibit "D"), a "confidential source" drove defendant from the Village of Orangeburg, County of Rockland, State of New York, to the County of Queens, State of New York, for the purported purpose of purchasing the documents that serve as the basis of the instant charge. The confidential source (hereinafter "CS") is also the purported source of the money to buy the subject documents. The documents were actually recovered not from defendant but rather the CS. See Exhibit "D" hereto. According to the statements on the compact disc, the documents were procured at the request of and for the use of the CS.

15. The CS herein will be a witness against defendant whether called or not called at trial inasmuch as the documents were allegedly recovered from the confidential source and the essence of the allegation is that the source did not have said documents before meeting with defendant but did have them afterward.

16. The CS has a lengthy history of alcohol abuse and arrests and at the time of his arrest had pending against him Felony Driving While Intoxicated charges. Subsequent to his contact with law enforcement personnel said charges were reduced to Disorderly Conduct as a non-criminal violation. Additionally, the CS, a legal alien, was threatened with deportation. Furthermore, the CS was threatened that if he did not cooperate he would be tied into a murder investigation.

17. More specifically, the history of the CS includes an arrest for DWI on or about May 22, 1989 and a subsequent conviction of same. He was again arrested on June 7, 2003 for

driving while intoxicated and was again convicted of same in the Justice Court for the Town of Ramapo, County of Rockland and State of New York.

18. In 2006, he was again arrested for driving while intoxicated. Since he had been previously convicted within the last ten years of driving while intoxicated, this charge was brought against him as a felony.

19. After his arrest, while the charges were pending against him, one morning in late 2006, there was a loud knocking on his door. It was approximately 6:00 a.m. He went back to sleep while his wife went downstairs to see who it was.

20. Four men were at the door. They pushed his wife out of the way and proceeded to enter his bedroom. They woke him up from his sleep, told him to remain in bed, and proceeded to seize his passport, work permit and related papers.

21. Among the four federal agents, were Kevin Laird and Dan McWilliam.

22. They then got him out of bed and placed him in the back of their minivan. They transported him to an office in Spring Valley, New York.

23. When he got to the office, they advised him that because he had felony proceedings pending against him he was subject to revocation of his status as a legal alien and could be deported. They told him that they could make arrangements so that he would never see his wife or his two babies again. They told him that he would go to jail on a felony conviction and from jail would be sent out of the country and never be permitted to return again. They also threw on the table a large stack of papers which they told him related to a murder investigation. They advised him that if he did not do as they directed they would allege he was tied to this murder.

24. They then advised him that they knew that he knew Oscar Lemus. They told him they knew that Oscar Lemus and he had worked together as gardeners.

5

25. They told him that they wanted him to set up Oscar Lemus for a crime. They said that the crime should be one which would have federal jurisdiction. They initially suggested that he advise Oscar Lemus that he was a hit man and was available for murder for hire. They also said he should try and have Oscar Lemus procure a gun for him and transport it across state lines. They said that if none of this worked he should arrange to procure false immigration documents in the presence of Oscar Lemus.

26. They told him that Oscar Lemus was not really their target. They told him they only wished to set up Oscar Lemus so that they could get leverage against Oscar Lemus to make him set up somebody else that they believed Oscar Lemus knew.

27. They told the CS that since Oscar Lemus was not really their target, they were only looking to arrest Oscar Lemus, make him set someone else up, and then deport Oscar Lemus. They told the CS that since they really did not want to place Oscar Lemus on trial, the CS would never have to testify in open court and that he could utilize any tactics available since neither his identity nor the tactics he used would ever see the light of day.

28. At the time they rousted him from bed, the CS told the federal agents that he did not want to go without talking to a lawyer. He had already retained counsel on his DWI charges. They told him that he was not to talk with a lawyer and placed him in the back of the minivan. His lawyers were never notified by the federal agents as to their dealings with the CS.

29. While he was in custody, after they had taken his papers away, they told the CS that he would not receive his papers back unless he did what he was told.

30. He was told to make Oscar Lemus confess to various crimes and told that if Oscar Lemus did not confess, then he should get Oscar Lemus on something. His photograph was taken.

31. The CS made a series of approximately ten telephone calls to Oscar Lemus at their direction.

32. After making most of the telephone calls, on February 8, 2007, he pled guilty to the violation of disorderly conduct in full satisfaction of the charges pending against him. The federal agents advised him that this offer to allow him to plead to a non-criminal offense was made at their direction and at their request. Such disposition is an illegal disposition under the provisions of NY VTL §1192.

33. On February 10, 2007, he made the last telephone call of the approximate ten telephone calls requested by the federal agents to Oscar Lemus. This is the telephone call that was recorded and is on the compact disc.

34. The CS knew that at that time the vehicle that belonged to Oscar Lemus did not properly operate. The CS knew that Oscar Lemus had made arrangements to purchase a new transmission at an auto body shop located in Queens, New York. The CS knew that Oscar Lemus had no way of getting to Queens, New York to obtain this transmission. The CS told Oscar Lemus that he would drive him to Queens, New York to the auto body shop so that Oscar Lemus could make arrangements to obtain the transmission.

35. The CS did this at the request of the federal agents who had advised him that they wanted him to find a way to spend a day with Oscar Lemus.

36. Shortly before he picked up Oscar Lemus on February 11, 2007, the federal agents supplied the CS with both money and photographs. They told the CS that he should make arrangements to secure immigration papers utilizing the money they supplied him and the photographs they had given him.

37. The CS had previously been to Roosevelt Avenue in Queens, New York, where he had bought radios on the street. At that time, he had been offered by people whose names he does not know the opportunity to purchase false immigration documents.

38. On February 11, 2007, the CS was directed by the federal agents to go back to Roosevelt Avenue in Queens, New York; to provide individuals thereat with photographs; to provide individuals thereat with money; and to request they utilize photographs to create immigration documents. He was told to bring Oscar Lemus with him so that Oscar Lemus would be present when the CS did this.

39. The CS was told by the federal agents that he would not get in trouble for doing this since he was being authorized by the federal government through them to create, procure, and obtain these documents.

40. The CS picked up Oscar Lemus on February 11, 2007 in his car. The CS had been wired by the federal agents so that his conversation would be recorded.

41. On February 11, 2007, the CS picked up Oscar Lemus in Rockland County having advised him that the CS would take him to Queens, New York to get the transmission for his vehicle. The CS drove them to Roosevelt Avenue in Queens. The CS pulled over on Roosevelt Avenue in Queens. The CS provided persons who identities are unknown to him with the photographs that had been provided to him by the federal government. He also provided them with half of the money for them to create the immigration documents utilizing these photographs. The CS was told to return in half an hour to an hour. Oscar Lemus and he went to lunch while these documents were prepared.

42. After lunch, in exchange for the other half of the money that had been provided the CS by the federal government, the CS received the documents referred to in Count One of the Indictment against Oscar Lemus.

43. The transfer of both the money and the documents occurred in Queens, New York. Subsequent to the transfer of the documents, the documents remained in the exclusive possession and control of the CS from the time he was in Queens, New York until such time as he surrendered the documents to the federal agents in Rockland County.

44. On February 11, 2007, Oscar Lemus was unable to locate the auto body shop in Queens, New York where he had desired to purchase the transmission.

45. The CS advised Oscar Lemus that on a subsequent date the CS would take Oscar Lemus back to Queens, New York.

46. The CS arranged for Oscar Lemus to come with him on March 3, 2007 to Queens, New York. The CS advised Oscar Lemus that the CS would take him to the auto body shop at that time.

47. The federal agents provided the CS with an automobile to drive from Rockland County, New York to Queens, New York even though they had full knowledge of the CS' driving records, prior license suspensions and revocations, and propensity to drive under the influence of alcohol. The federal agents also provided the CS with photographs to be used for the creation of immigration papers and money to pay to have such documents created.

48. On March 3, 2007, the CS once again drove himself and Oscar Lemus to Roosevelt Avenue in Queens, New York. The CS gave the money to some third party whose identity the CS did not know.

49. Shortly thereafter, the CS received the documents referred to in Count Two of the Indictment of Oscar Lemus. The CS received these documents in Queens, New York. The CS secreted these documents in the ashtray of the vehicle that had been supplied to him by the federal government. These documents remained in the exclusive control of the CS from the time

9

he was in Queens, New York until the time he returned to Rockland County and gave these documents to the federal agents.

50. In August 2007, the CS was advised by the federal agents that Oscar Lemus had been indicted and had pled not guilty. The CS was subsequently advised by the federal agents that Oscar Lemus was refusing to accept a plea and that as a result the CS was going to be required to testify in open court. The CS advised the federal agents that he did not want to have to testify to the things he had done. Nonetheless, they advised him that he was going to have to appear in open court and testify against Oscar Lemus and say that Oscar Lemus was responsible for the transfer of the documents.

51. The stated purpose by the CS as to why he wanted documents was for the CS to give such documents to his coworkers.

52. All overt acts in the purchase, procurement and transfer of the documents were performed by the CS.

53. Oscar Lemus did not receive or request any profit or portion of the monies for said documents.

### D. Discovery/Bill of Particulars

54. Annexed hereto as Exhibit "E" is a letter from the prosecutor attaching to it all the discovery the prosecution has provided to date (except for the aforementioned compact disc). It is hardly responsive to the demand of defense counsel, a copy of which is attached hereto as Exhibit "F" and incorporated herein.

55. As more fully set forth in the annexed Memorandum of Law, fairness, statute, case law and the Constitution dictate further discovery.

**E.  The Compact Disc**

56. The prosecution has provided defense counsel with a certain compact disc. Of note is that the three conversations are listed as "2a", "2b" and "3a". No explanation is given as to why there is no "1" or whether there are any other tracts. It is submitted that defendant is entitled to the totality of the subject disc including any other tracts including, but not limited to, any other conversations allegedly containing defendant's voice.

57. Furthermore, the compact disc is in whole or part inaudible. For reasons set forth in the annexed Memorandum of Law, it is submitted defendant is entitled to an audibility hearing as well as any transcripts of the subject tapes.

58. Furthermore, a strange state of facts exists when the Felony Complaint, the compact disc and Indictment are reviewed. According to same, it was the CS who allegedly drove the defendant from the defendant's home in Rockland County to the scene of the crime in the Borough of Queens, and from the Borough of Queens to the defendant's home in Rockland County. It was the CS who allegedly received the funds from the Federal Government to purchase the contraband. On the compact disc, the CS is heard discussing his own desire to obtain false documents for his own purposes, and his own propensity toward violence and indeed for committing murder. It is respectfully submitted that any log, notations, summaries or reports of any contact between defendant and the CS and/or any other agent of law enforcement and/or summaries of statements of defendant constitutes *Brady* material.

**F.  Defendant's Statements**

59. To date, defendant has received the aforementioned compact disc and the aforementioned heavily redacted report (Exhibit "B" hereto). However, there were substantial other contacts between defendant and the government's CS commencing prior to the February 10, 2007 telephone call which have continued long after defendant's arrest and retention of

counsel including a telephone call to defendant on September 20, 2007 and an unannounced visit at midnight on September 21, 2007 by the CS to defendant's home at which time he spoke to defendant. No records of a number of such contacts or the summaries of any statements by defendant have been provided. Additionally, defendant following his arrest was held and questioned for approximately thirteen hours prior to the time he was produced at the courthouse. There are obviously notes, memoranda, and other documents in existence reflecting these questions and answers other than the single limited references contained in Exhibit "B". Furthermore, after the arrest of defendant and after retention of counsel, two different investigators from two different District Attorney's offices who are involved in a Joint Task Force involving the federal authorities appeared unannounced at defendant's home and sought to question him outside the presence of counsel. Of note is that both such visits immediately preceded appearances in Court in the instant matter. Notes, memoranda and related documents also obviously exist as to same.

      **WHEREFORE**, your deponent respectfully requests an Order of this Court granting the relief set forth in the annexed Notice of Motion, together with such other and further relief as this Court may deem just, proper and equitable.

/S

_____

**CHRISTOPHER RILEY (CR-0975)**

Sworn to before me this
4th day of October, 2007

_____

Notary Public